1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LARRY JOHN FARRIS, III,

11            Petitioner,              No. CIV S-04-1758 GEB KJM P

12       vs.

13   SCOTT M. KERNAN, Warden,

14            Respondent.             FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prison inmate proceeding with counsel with an amended

17   petition for a writ of habeas corpus.  He challenges his Placer County conviction for robbery and

18   use of a firearm on the ground that he did not receive the effective assistance of counsel.

19            This court held an evidentiary hearing and directed the parties to provide

20   additional records.

21   I. Factual Background

22            On June 29, 2001, two masked men robbed the Millenium[1] Smoke Shop in

23   Roseville, making off with money and "an unknown quantity of smoking bongs . . . ."  Lodged

24   Document (Lodg. Doc.) 9 at 3, 5 (police reports).

25   _____

26   [1] The court uses the spelling of the business as shown on the reward poster.  Lodg. Doc. 17.

1

1    Robin Giffin, the owner of the smoke shop, prepared a reward poster, showing a

2    rare smoking pipe taken in the robbery and offering a $5,000 reward.  Id. at 12; Lodg. Doc. 17

3    (reward poster).

4    On July 12, 2001, Detective Michael Allison of the Roseville Police Department

5    met with Giffin, who reported he had learned of the robbers' identity from a customer, whom he

6    declined to name, who in turn had received information from someone else, to whom the robbers

7    had confessed.  Lodg. Doc. 9 at 15-16.  The robbers allowed the customer's friend to use one of

8    the pipes taken in the robbery; Giffin identified it.  Id.  Allison received additional information

9    from Giffin on July 13 and 17.  Id. at 16-17.

10    During the early morning hours of July 18, 2001, Mark Reynolds was getting out

11    of his car when he was approached by two men, one Hispanic, one white.  Reynolds identified

12    the white man, who was armed with a stun gun, as William Scott Planer, but could not identify

13    the Hispanic man, who had been armed with a gun.  Pet., Ex. 6 at 23.  Reynolds gave Planer his

14    wallet, cell phone, and a backpack containing marijuana.  Id. at 23, 25-26.  Police located Planer

15    at his home and arrested him for the robbery.  Id. at 26.  Planer was with Zachary Miller, who had

16    Reynolds' Hollywood Video card.  Id. at 29.  Police brought Reynolds to Planer's house; he

17    identified Planer as one of the robbers but said Miller had not been present during the robbery.

18    Id. at 31.

19    On July 20, 2001, Allison prepared an affidavit for a warrant to search petitioner's

20    apartment.  The affidavit reads in relevant part:

21    On June 29, 2001 Alma Rodriguez was the victim of an armed
     robbery that occurred at 1079 Sunrise Ave., Suite M Roseville,
22    CA.  Rodriguez was working with two other employees (Biagi,
     Martinez) at the Millenium Smoke Shop at approximately 2205
23    hours when the robbery occurred.  Rodriguez had just closed the
     shop for the night and was exiting the rear door to the business
24    when she encountered the two suspects.  The suspects ordered all
     three employees back into the business at gunpoint.  Both suspects
25    were armed with handguns that they readily displayed to the
     employees.  One of the suspects threatened to shoot the employees
26    if they did not do as they were instructed.  The suspects directed

2

the victims into the office of the business where they robbed them of their personal property, including Biagi's wallet.  The suspects brought their own duffle bag with them to carry the stolen merchandise.  The suspects used duct tape to secure the three employee's [sic] hands.  The suspects brought the duct tape in with them to the robbery.  When the suspects were in the office they ordered Rodriguez to remove all of the valuables from the safe, including an undisclosed amount of cash.  The suspects then directed Rodriguez to several cash registers in the business, ordering her to open them and retrieve the cash from them.  The money was then given to the suspects.  The suspects also took a large amount of merchandise from the business.  The merchandise was very distinctive in appearance.  The property taken was numerous hand-blown water pipes.  One of the pipes that was taken was very distinctive in size and appearance.  The suspects were in the business for approximately 15 to 20 minutes before they fled.  Before fleeing, the suspects took the telephone receivers from the phones in the business.  Both suspects were described as wearing masks, surgical gloves, and black "Raiders" shirts.

On July 9, 2001, your affiant was assigned follow up investigation on the aforementioned robbery.  Your affiant met with Robin Giffin, the owner of the Millenium Smoke Shop, at approximately 1000 hrs on July 12, 2001.  Giffin reported he had a confidential informant that told him who robbed his shop.  He said the informant told him Brent Forman and Larry Farris were responsible for the robbery.  Giffin told your affiant that this informant had received the information from a friend who knew Forman and Farris.  Giffin told your affiant that his informant was informed by his friend that Forman and Farris had confessed to him that they had committed the robbery.  Furthermore, Giffin's informant said his friend was actually given one of the glass pipes that was taken in the robbery by Forman and Farris.  Your affiant was told by Giffin that his informant was allowed to take the pipe to use it.  Giffin told your affiant that his informant brought the pipe to him and showed it to him.  Your affiant was told by Giffin that he viewed the pipe and positively identified it as one of the pipes that was stolen in the robbery. Giffin told your affiant that his informant was told by his friend that Farris had one of the stolen pipes at his apartment.  The pipe was a large, very distinguishable, hand-blown water pipe.  Giffin gave your affiant a photograph of the pipe for reference.

On July 13, 2001, your affiant met with Giffin a second time.  Giffin told your affiant that he had learned where Farris lived.  Giffin told your affiant his informant obtained Farris' telephone number from the friend that had given him the stolen pipe.  Giffin said he called the telephone number and a female answered the phone.  Giffin told your affiant that he terminated the call when the female answered the phone.  Giffin indicated he immediately received a return call from the residence he had called.  He said the

1   caller I.D. on his telephone identified the caller as Dana Moyer at
    302 Hendry Circle Rocklin, CA.
2
    On July 17, 2001 your affiant went to the address Giffin identified
3   as Farris'.  The address was actually part of the Stanford Heights
    apartment complex at 5801 Little Rock Rd Rocklin, CA.  Farris'
4   apartment was in the complex and had a separate address of 302
    Hendy Circle, Rocklin, Ca.  I contacted the apartment manager and
5   discovered that Farris was one of the individuals who leased the
    apartment.
6
    On July 20, 2001, your affiant spoke with Giffin via telephone at
7   his place of business.  Giffin told your affiant he had just spoken to
    his informant.  Giffin said his informant indicated that Farris and
8   Forman had sold most of the stolen glass pipes, except for the
    largest one.  Giffin indicated his informant told him the large pipe
9   was still at Farris' apartment.  Giffin told your affiant his informant
    wished to remain confidential because he was afraid for his safety.
10  Giffin indicated his informant turned down a $5,000 dollar reward
    to reveal whom his friend was that received the stolen pipe.  Giffin
11  informed me that he knew who both the suspects were because
    they had been previous customers.  He said he remembered seeing
12  both suspects in his store, not necessarily at the same time.  Giffin
    told your affiant he has seen Forman in his business since the
13  robbery.  He indicated Forman asked him questions about the
    circumstances of the robbery.  Giffin also informed your informant
14  he has seen both Forman and Farris together in the past.  He
    indicated that he has seen Farris driving in a blue Ford Expedition.
15  When your affiant contacted the manager at the apartment complex
    where Farris lives, I was informed that he drives a blue 1998  Ford
16  Expedition.

17  Additional facts to support the probable cause to issue the warrant:
    Forman is on informal court probation for a conviction of 417.4
18  P.C. –Brandishing an imitation firearm.  During the robbery at the
    Mellenium [sic] Smoke Shop, Biagi (victim) reported that the guns
19  that the suspects were holding looked "fake and toyish."  Finally,
    the description of the two robbery suspects is similar to Farris and
20  Forman.  Farris' drivers license describes him as 6-2 tall, 213 lbs,
    with brown hair and brown eyes.  One of the suspects from the
21  Mellenium [sic] robbery was described as 6-0 tall weighing 200
    lbs.  Forman is described as 5-8 tall weighing 134 lbs.  The other
22  suspect from the Mellenium [sic] robbery was described as 5-8 to
    5-10 tall weighing 150 to 170 lbs.
23

24  Petitioner's Evidentiary Hearing Exhibits (PEHE), Ex. 5.

25          Allison drafted the affidavit and gave it to the District Attorney's Office for

26  review; Jeff Penny and Bill Markie approved it.  Lodg. Doc. No. 9 at 18.

Police executed the search warrant at 11:00 p.m. on July 20, 2001; Forman, Farris and Dana and Sabrina Moyer were in the apartment.  Id. at 18-19.  Forman told officers there was a loaded 9 mm gun in a bedroom closet and Farris told them there was quarter of an ounce of marijuana in the freezer.  Id. at 19.

Dana Moyer told police that Forman and petitioner had robbed a bong shop in Roseville and had returned with two back packs full of bongs.  They sold most of the bongs, but one was on top of the entertainment center.  Id. at 20.

After waiving his Miranda rights, petitioner admitted he had robbed Mark Reynolds in July 2001 along with Forman and Scott Planer and that he, Forman, and Joshua Merritt committed the robbery of the Millenium smoke shop.  Id. at 21-22.  He said one of the bongs was in the living room.  Id. at 22.

Shortly after midnight on July 21, 2001, Roseville police officers went to Merritt's home and placed him under arrest.  After waiving his Miranda rights, Merritt related that Farris and Forman had placed the Millenium robbery; that he and Farris had actually committed the robbery while Forman waited in the car; and that Farris had given him an electronic scale and one of the bongs taken in the robbery.  Id. at 23.

On August 23, 2001, following a guilty plea, Zachary Miller gave a statement about the Reynolds robbery to the Placer County District Attorney's office.  Pet., Ex. 6 at 32. Miller told authorities that on the night of the Reynolds robbery, he met with Planer and Forman and a person named "Larry."  Planer gave Forman his car keys and told Forman and Miller to drive around while he and Larry obtained some marijuana from Reynolds.  Id. at 33.  When Planer and Larry returned to the car, they had a backpack that smelled of marijuana.  Larry gave Miller a Hollywood Video card with Reynolds' name on it.  Miller described Larry as a white male, 18-19 years old, who drove a blue Ford Explorer and lived with his girlfriend.  Id.

In August 2001, Kevin Burdick was appointed to represent petitioner.  Docket No. 49 (case file, Placer County Superior Court Case No. 62-002839).  Burdick has been a criminal

5

defense attorney in Placer County for twenty years.  RT 8.  His file, which was obtained by habeas counsel, contains a copy of the search warrant and affidavit, included with other discovery provided to Burdick on August 29, 2001.  See Docket. No. 51 (Burdick file; Discovery Request And Record And District Attorney Offer, dated 8/29/01).  On that date, Burdick billed for reviewing the discovery and talking to petitioner.  See Docket No. 58 (Sealed Billing Records).  At the evidentiary hearing, Burdick testified it is his practice to "review suppression issues from the outset."  RT 16.  He does not recall, however, whether he conducted any legal research in this case.  RT 18.  His billing records do not reflect time for research.

Petitioner and his mother, Kelley Farris, testified, however, Farris went to Burdick's office sometime in August 2001, shortly after Burdick had been appointed to represent petitioner.  RT 53-54, 81.  They met for ten to fifteen minutes to discuss the charges and Burdick told them the prosecutor would probably offer a three to five year plea deal.  RT 54, 67, 82.  Burdick told them petitioner should definitely take the deal because the charges were very serious.  RT 54.  Burdick did not mention the possibility of a motion to suppress and did not discuss the affidavit in support of the search warrant.  RT 55, 83.  Burdick did not suggest there was any way to leverage a better offer or even inform petitioner of his maximum exposure if he were convicted of all the charges.  RT 55, 82.

According to Burdick, however, he discussed with petitioner the feasibility of making a motion to suppress the evidence seized under the authority of the search warrant, as was his practice.  RT 5.  He did not, however, file a motion to suppress because he did not believe it would be successful, in part because of the overwhelming evidence against petitioner.  RT 6.

On August 31, 2001, a first amended complaint was filed in Placer County Superior Court, charging petitioner and Forman with conspiracy to commit robbery, three counts of second degree robbery and three counts of false imprisonment by violence, all stemming from the Millenium Smoke Shop robbery.  The complaint also charged petitioner and Forman with

conspiracy to commit robbery, second degree robbery, false imprisonment by violence and receiving stolen property, all arising from a robbery of Mark Reynolds.  Finally, it was alleged that petitioner personally used a gun in connection with several of the counts and that a principal in the offenses was armed with a firearm.  Respondent's Evidentiary Hearing Exhibits (REHE), Ex. G.

Before one of the court appearances, Burdick pulled petitioner aside and said that the prosecutor's offer was for thirteen years.  RT 83.  Petitioner said he did not want to accept that offer, but Burdick encouraged him to accept it.  RT 83-84.

Petitioner was facing federal charges at the same time, and Kelley Farris hired Kathryn Druliner to represent him on the federal charges.  RT 57, 101.  Druliner reviewed petitioner's state case, offered him a second opinion on it, and attempted to talk to Burdick about it.  RT 101-102.  She also called the district attorney's office, but the deputy handling the case would not talk to her because she was not the attorney on the Placer County case.  RT 116.  From her experience in practicing in Placer County, however, Druliner believes that the prosecutors "do not negotiate, you do not get a deal."  RT 118.

Druliner was able to secure a copy of the discovery from Burdick, but only after asking for it on three occasions.  RT 109.  At some point, Druliner met Burdick in court in Placer County and requested a copy of the Placer County discovery from Burdick.  RT 15.  Although she also asked for a copy of the search warrant and supporting affidavit, she avers Burdick did not provide them to her.  RT 110-111; PEHE, Ex. 15 ¶¶ 4, 7 (Declaration of Kathryn Druliner) & Ex. 10 ¶¶ 15-16 (Declaration of Kelley Farris); cf. PEHE, Exs. 12 (Druliner's letter to Burdick requesting file including search warrant affidavit), 13 (Druliner's letter to Burdick acknowledging receipt of "discovery").  Druliner ultimately wrote to Burdick, outlining petitioner's dissatisfaction with his representation.  RT 103-104.

/////

/////

1    On October 12, 2001, petitioner told the court he wanted new counsel, so the

2  court held a <u>Marsden</u> hearing.[2]  Petitioner told the court he had problems getting in touch with

3  Burdick and that Burdick had not provided him copies of the discovery in a prompt fashion.

4  PEHE, Ex. 7 at 5-6.  Burdick stated in response:

5              I have talked to him about issues with – relating to his,
             his statements and what motions we might bring and might not bring;
6              however, I have not taken any action at this time basically because
             I was waiting to see whether the case would settle fairly quickly in
7              a favorable basis and what was going to happen with his federal
             charges and how that might impact this case. . . . .

8

9  <u>Id</u>. at 7.  At the evidentiary hearing, Burdick acknowledged that this was correct.  RT 25.

10    Petitioner told the court that Druliner had been giving him a second opinion on

11  this case, but that his mother could not afford to pay her fees for the state case as well.  PEHE,

12  Ex. 7 at 6, 8-9.  Burdick acknowledged he had received a letter from the "second opinion"

13  lawyer.  <u>Id</u>. at 7.[3]  The court denied the <u>Marsden</u> motion.  <u>Id</u>. at 10.

14    Burdick was involved in conversations with Deputy District Attorneys David

15  Tellman and Estelle Tansey.  DEHE, Exs. K ¶ 6 & L ¶ 5 (Tellman and Tansey Declarations).  For

16  a while, Burdick was attempting to resolve the state and federal cases globally, in conjunction

17  with Ms. Druliner.  RT 6.  Tellman believed that defendant faced at least twenty-five years in

18  prison, but offered Burdick a plea agreement that would result in a fourteen year sentence.

19  DEHE, Ex. K ¶¶ 7-8.  According to Tellman, it was his practice to make a plea offer shortly after

20  arraignment, with the offer remaining viable for a limited time only.  RT 127-128.  He would

21  generally not keep an offer open if he had to prepare an opposition to a defense motion.  <u>Id</u>.  His

22  practice is to inform defense counsel that the offer would be held open until "the start of

23

24    [2] <u>People v. Marsden</u>, 2 Cal.3d 118 (1970).

25    [3] In the letter, Druliner advises Burdick that petitioner is concerned about Burdick's
26  failure to "develop[] the facts" that might support a motion to suppress his statement.  Pet., Ex.
    13.

1   whatever the next stage is, the preliminary hearing, motion to suppress, pretrial motions,

2   whatever . . . ." RT 129. Most defense counsel who practice in the county understand this. Id.

3   According to Deputy District Attorney Estelle Tansey, the Placer County District Attorney's

4   Office had an informal policy of rescinding offers, particularly good offers (a percentage of total

5   exposure), if litigation proceeded. RT 157-158. Generally, if she "had to do the work to respond

6   to the motion," an offer would be withdrawn. RT 160; DEHE, Ex. K, ¶¶ 10, 11 & Ex. L ¶¶ 7-8.

7   Burdick also said the district attorney's office would not hold an offer open while the defense

8   pursued pretrial litigation: "offers are only held open until they're withdrawn" because "that is

9   the culture of the county." RT 9.

10          Burdick recalled that Tellman made petitioner an eleven year offer, but it was

11   withdrawn before they could accept it. RT 6-7. Once the co-defendant made an agreement to

12   testify against petitioner, the offer increased to fourteen years. RT 7. Neither party has presented

13   any evidence suggesting which co-defendant agreed to testify against petitioner. Burdick's file,

14   however, contains a copy of Joshua Merritt's probation report, showing that Merritt had pleaded

15   no contest to robbery and firearms use on November 2, 2001. Docket No. 51 (Probation Report

16   at 6). The report does not refer to any plea agreement for testimony, but it does contain Merritt's

17   statement to the probation officer implicating petitioner in the robbery of the smoke shop. Id.

18   (Probation Report at 8-10).

19          Burdick met with petitioner and his mother on a couple of occasions and told

20   them the prosecution had extended a plea offer with a sentence of fourteen years. RT 7; PEHE,

21   Ex. 8 (Petitioner's Declaration) ¶ 5. Burdick counseled petitioner to accept the offer and said he

22   did not want to do anything to anger the prosecutor. Id. Burdick also told him the case was

23   hopeless because of petitioner's and Merritt's confessions, and petitioner "had to accept whatever

24   offer they made." Id. ¶ 9; DEHE, Ex. M (Burdick Declaration) ¶ 3. According to petitioner,

25   Burdick never advised him of the possibility of filing a motion to suppress. Pet., Ex. 8 ¶ 2.

26   /////

Burdick avers:

> I considered bringing a suppression motion challenging the search
> warrant.  However, in my professional opinion, the possibility that
> a suppression motion would be denied carried too great a risk for
> Mr. Farris in terms of the subsequent likelihood of his conviction
> at trial and the potential length of his prison term.  I believed that a
> fourteen-year prison sentence would be better than gambling with a
> potentially longer prison sentence, even if that gamble also carried
> the possibility of a successful suppression motion that would lead
> to the reduction or dismissal of the charges.
>
> I explained to Mr. Farris my beliefs . . . . He appeared to
> understand my opinion and he agreed with my assessment.  I fully
> believed that he was in favor of accepting the offer.

DEHE, Ex. M ¶¶ 4-5.

Burdick did not recall how many times he met with petitioner to discuss the case, nor the length of any of the meetings.  RT 13.  The billing records show ten contacts, in person, by letter or by telephone with petitioner, and one with his mother.  See Docket No. 58.  Petitioner says he camped out in front of Burdick's office and eventually was able to meet with him for five to ten minutes.  RT 84.  Burdick told him the offer had increased to fourteen years.  RT 85. Burdick advised petitioner to take the deal because "there was no way we could beat this."  Id. Petitioner did not have any other meetings with Mr. Burdick about the case, even though both he and his mother called Burdick numerous times.  RT 56, 86.

The minutes for October 24, 2001[4] contain the following notation: "DA-Offer Plea to 211 PC Admit 12022.5 All.  Plea to ct. 9 211 PC Harvey Bal. 14 yr CDC."  Docket No. 49-2.  The accompanying reporter's transcript documents petitioner's waiver of the preliminary

/////

/////

/////

---

[4] Although the minutes list 10/23/01 as the date, it appears that this hearing took place on October 24, 2001.  The reporter's transcript of the waiver of preliminary hearing gives the date as October 24; the minutes document the waiver of preliminary hearing and the holding order.

1  hearing and the following:

2           MR. TELLMAN: Yes.  And we would state for the record the
3           offers that have been made prior to the waiver and that they would
         remain open until the trial confirming conference.

4           THE COURT: State it for the record.

5           MR. TELLMAN: For the record, as to Mr. Farris, our offer is to
6           plead to one count of Penal Code Section 211 as it relates to the
         June 29th, of this year, incident, and admit the 12022.53 allegation
7           as to that 211 and a plead [sic] to Count 9, which is a violation of
         211 as to Mark Reynolds with a Harvey waiver as to the balance
8           for a stipulated 14 years in prison.

9  Id. (10/24/01 RT 6).  The court then set the trial confirming date for December 14, 2001, noting

10  that would "be the last date for motions, if there are any motions."  Id. (10/24/01 RT 7).

11        On February 19, 2002, petitioner entered a plea of guilty to one count of robbery

12  arising from the Millenium Smoke Shop incident and one count of robbery of Mark Reynolds

13  and admitted that he personally used a firearm in connection with the Millenium robbery in

14  exchange for a stipulated sentence of fourteen years.  Lodg. Docs. 3 (plea form) & 11 (transcript

15  of entry of plea).  Petitioner had decided to plead guilty because he did not feel confident going

16  to trial with Burdick.  RT 97.  Had petitioner known that a motion to suppress was a possibility,

17  he would not have accepted the plea offer.  RT 87.  However, petitioner did not have a chance to

18  review the affidavit in support of the search warrant until the state proceedings were concluded.

19  RT 88-89.

20        Petitioner did not appeal his conviction.  However, on June 28, 2003, he filed a

21  petition for a writ of habeas corpus in the Placer County Superior Court, raising a claim of

22  ineffective assistance of counsel.  Lodg. Doc. 5.  This was followed by petitions in the Court of

23  Appeal for the Third Appellate District and a petition for review in the Supreme Court.  Lodg.

24  Docs. 6 and 7.

25  /////

26  /////

1    The Superior Court issued the only reasoned decision resolving the state habeas

2    petitions:

> The petition for Writ of Habeas Corpus is denied for the reason
> that petitioner fails to present sufficient grounds for relief as
> requested.
>
> Petitioner bears the burden of stating a prima facie case showing
> that he is entitled to relief. . . . In that regard, petitioner is obliged
> to state with particularity the facts upon which the petition is
> based; vague, conclusary [sic] allegations are insufficient to
> warrant issuance of a writ.  Petitioner has the burden of proving the
> facts upon which he bases his claim for relief.
>
> Petitioner raises a claim of ineffective assistance of counsel.  To
> prevail on such a claim, petitioner has the burden of demonstrating
> that but for the failings of counsel, a more favorable result would
> have been obtained.  While petitioner alleges the fact of ineffective
> assistance of counsel, he has wholly failed to present any evidence
> that the results of his case would be any different.

12   Pet., Ex. 1 at 1-2 (internal citations omitted).

13   II.  Standards Under The AEDPA

14    An application for a writ of habeas corpus by a person in custody under a

15   judgment of a state court can be granted only for violations of the Constitution or laws of the

16   United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

17   claim decided on the merits in state court proceedings unless the state court's adjudication of the

18   claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

23   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

24   365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

25   under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

26   Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[5]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

_____

    [5]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1       The court will look to the last reasoned state court decision in determining

2   whether the law applied to a particular claim by the state courts was contrary to the law set forth

3   in the cases of the United States Supreme Court or whether an unreasonable application of such

4   law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

5   919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

6   of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

7   must perform an independent review of the record to ascertain whether the state court decision

8   was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

9   words, the court assumes the state court applied the correct law, and analyzes whether the

10  decision of the state court was based on an objectively unreasonable application of that law.

11      It is appropriate to look to lower federal court decisions to determine what law has

12  been "clearly established" by the Supreme Court and the reasonableness of a particular

13  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

14  III.  Analysis

15      Petitioner argues that Burdick did not act effectively in advising him to plead

16  guilty without discussing the possibility of pursuing a motion to suppress the evidence seized

17  from his apartment.  Pet. at 3-8.

18      In Hill v. Lockhart, the Supreme Court explored the question of an attorney's

19  effectiveness in advising a criminal defendant to plead guilty:

20          [A] defendant who pleads guilty upon the advice of counsel may
            only attack the voluntary and intelligent character of the guilty plea
21          by showing that the advice he received from counsel was not
            within the standards set forth in McMann.[6]
22

23  474 U.S. 52, 56-57 (1985).  The Court continued:  the "two-part Strickland v. Washington test

24  applies to challenges to guilty pleas based on ineffective assistance of counsel."  Id. at 59.  Under

25  _____

26      [6]  McMann v. Richardson, 397 U.S. 759 (1970).

14

that two part test, a "defendant must show that counsel's performance was deficient.  This

requires showing that counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed by the Sixth Amendment.  Second, the defendant must show that the

deficient performance prejudiced the defense."  Strickland v. Washington, 466 U.S. 668, 687

(1984).

Under Strickland, a court faced with a claim of ineffective assistance of counsel

must presume that counsel was competent, a presumption that a habeas petitioner or criminal

appellant must rebut.  Id. at 689.  The Court in Strickland provided some guidance on the

evaluation of the "performance" prong of its test:

> strategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances, applying a heavy measure of deference to
> counsel's judgments.

Id. at 690-91; see Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) ("we have found

counsel to be ineffective where he neither conducted a reasonable investigation nor made a

showing of strategic reasons for failing to do so.").  Counsel's actions cannot be judged from a

position of hindsight, but must be evaluated "from counsel's perspective at the time" of the

alleged error.  Strickland 466 U.S. at 689.

To establish the second, or prejudice, prong of Strickland's test: a petitioner "must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different.  A reasonable probability is a probability sufficient

to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  When the claim is that

/////

/////

15

counsel's ineffectiveness prompted petitioner to plead guilty without a complete understanding of his options:

> The second, or "prejudice" requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than to go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Hill, 474 U.S. at 59.

The Supreme Court has defined Strickland's prejudice prong when the allegation is a failure to litigate a motion to suppress:

> Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); see also Bailey v. Newland, 263 F.3d 1022, 1029 (9th Cir. 2001).

Petitioner argues that the affidavit in support of the search warrant did not provide probable cause for the search and that trial counsel's failure to file a motion to suppress or even advise petitioner about the possibility of pursuing such a motion rendered Burdick's advice regarding the plea offer untenable.

Respondent counters that Burdick had valid, tactical reasons for eschewing a motion to suppress: by making a motion, he would have caused the prosecutor to withdraw a

1    favorable plea offer and the motion was not likely to succeed.

2          Under either the <u>Hill</u> or <u>Kimmelman</u> test, and to resolve the parties' competing

3    claims, the court must consider the viability of the motion to suppress.[7]

4          A.  The Search Warrant Affidavit

5          The basic requirement for the issuance of a search warrant is that it be supported

6    by probable cause:

> 7    Probable cause exists where 'the facts and circumstances within
> their (the officers') knowledge and of which they had reasonably
> 8    trustworthy information (are) sufficient in themselves to warrant a
> man of reasonable caution in the belief that' an offense has been or
> 9    is being committed.

10    <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76 (1949) (quoting <u>Carroll v. United States</u>, 267

11    U.S. 132, 162 (1925)).  The same standard applies even if the affidavit is based on hearsay:

> 12    The task of the issuing magistrate is simply to make a practical,
> common-sense decision whether, given all the circumstances set
> 13    forth in the affidavit before him, including the "veracity" and
> "basis of knowledge" of persons supplying hearsay information,
> 14    there is a fair probability that contraband or evidence of a crime
> will be found in a particular place.  And the duty of the reviewing
> 15    court is simply to ensure that the magistrate had a 'substantial basis
> for ... conclud[ing]' that probable cause existed.
> 16

17    <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983); <u>see also</u> <u>Jones v. United States</u>, 362 U.S. 257, 269

18    (1960) ("an affidavit is not to be deemed insufficient" because it is based on hearsay "so long as

19    a substantial basis for crediting the hearsay is presented"), <u>overruled on other grounds</u>, <u>United</u>

20    <u>States v. Salvucci</u>, 448 U.S. 83 (1980) .

21          Although the United States Supreme Court has not considered the corroboration

22    requirements when an affidavit contains multiple layers of hearsay, the Courts of Appeals and the

23

24

25         [7] In <u>Cooper-Smith v. Palmateer</u>, 397 F.3d 1236, 1244 n.33 (9th Cir. 2005), the Ninth Circuit declined to resolve the parties' dispute over whether the <u>Hill</u> or the <u>Kimmelman</u> standard

26    applies when a petitioner has pled guilty but alleges that counsel acted unreasonably in connection with a motion to suppress.

California courts have.[8]  These courts recognize that "multiple layers of hearsay may support a finding of probable cause for a search warrant," United States v. Mathis, 357 F.3d 1200, 1204 (10th Cir. 2004), so long as "a 'substantial basis' for crediting the hearsay statements [is] provided for each level of hearsay, i.e., at the secondary source level as well as the primary source level." People v. Love, 168 Cal.App.3d 104, 109-10 (1985); compare United States v. Campbell, 732 F.2d 1017, 1020 (1st Cir. 1984) (no probable cause when informant, whose reliability was unknown, gave information to crime victim, who gave it to police).

The first hearsay account came from Robin Giffin, the crime victim, whose statements are considered reliable support for a search warrant affidavit.  United States v. Sparks, 265 F.3d 825, 830 (9th Cir. 2001), overruled on other grounds, United States v. Grisel, 488 F.3d 844 (9th Cir. 2007); United States v. Armstrong, 654 F.2d 1328, 1335 (9th Cir. 1981); People v. Ramey, 16 Cal.3d 263, 268-69 (1976) ("probable cause will not be provided by conclusory or anonymous informants, but neither a previous demonstration of reliability nor subsequent corroboration is ordinarily necessary when witnesses to or victims of criminal activities report their observations in detail to the authorities.").  However, Giffin's own observations are limited to these: he had called a telephone number ostensibly belonging to petitioner and received a call back from someone his caller ID identified as Dana Moyer, at an address in Rocklin; he knew both petitioner and Forman as customers of the smoke shop; he had seen Forman in the smoke shop since the robbery and Forman had questioned him about the robbery; he had seen petitioner driving a blue Ford Expedition; and he had been shown a pipe taken from his shop.  Pet., Ex. 5.

---

[8]  In the hypothetical state court ruling on a motion to suppress, presented in the post hearing briefing, respondent chides petitioner for his reliance on Court of Appeals cases. Respondent's Post Hearing Brief at 7-8 & n.5.  As he notes, the California Supreme Court has described the impact of Proposition 8: "Our state Constitution thus forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court."  In re Tyrell J., 8 Cal.4th 68, 76 (1994), overruled on other grounds, In re Jaime P., 40 Cal.4th 128 (2006).  When there is no authority from the Supreme Court, decisions of the lower federal courts are entitled to great weight, but are not binding.  Id. at 79.

Detective Allison learned that petitioner was one of the tenants in the apartment rented by Dana

Moyer and that he drove a 1998 blue Expedition.  Id.

Giffin was the conduit for other information, which he received from "a

confidential informant," who had, in turn, received it from a friend.  Giffin did not identify the

informant who, he reported, feared for his safety.  According to Giffin, this informant had

refused to name his friend, even in exchange for a $5,000 reward.  Id.

According to Giffin, the friend provided the following information:  petitioner and

Forman confessed to the robbery; petitioner and Forman allowed the friend to use one of the

pipes taken in the robbery; the friend allowed the informant, in turn, to take the pipe, which he

showed to Giffin, who identified it as one taken in the robbery; petitioner had one of the stolen

pipes in his apartment;[9] the friend obtained petitioner's telephone number and provided it to the

informant, who in turn provided it to Giffin.  Id.

The affidavit was fleshed out with the following information: petitioner, at 6'2"

and 213 pounds matched the description of one of the robbers as 6' tall and 200 pounds and

Forman, at 5'8 and 134 pounds matched the description of the other robber as 5'8" to 5'10" and

150-170 pounds.  In addition, Forman had a prior conviction for brandishing an imitation firearm

and one of the victims of the smoke shop robbery described the robbers' guns as looking "fake

and toyish."  Id.

The Supreme Court has considered the use of anonymous tips to establish

reasonable suspicion or probable cause in several cases.  In Illinois v. Gates, supra, the police

received an anonymous letter providing the following details about Lance and Susan Gates' drug

dealing activities:  the couple lived in a certain condominium complex; Susan Gates generally

drove the couple's car to Florida, where the drugs were loaded, and then flew home; Lance Gates

then usually flew to Florida and drove the car home; they stored the drugs in their basement; big

---

[9]  Although the affidavit is not altogether clear on this point, it appears that the pipe the
friend was allowed to use and that Giffin identified was the pipe kept in petitioner's apartment.

drug dealers often visited their home.  Police then confirmed the couple's address and the fact

that Lance had a reservation on a flight to West Palm Beach.  When Lance landed in Florida,

police followed him to a Holiday Inn, to a room registered to his wife.  The next morning police

observed the couple leave the hotel and head north.  Police obtained a warrant and searched the

Gates's home and car when they arrived from Florida.  462 U.S. at 213.

In <u>Gates</u>, the Supreme Court overruled its previous decisions of <u>Aguilar v. Texas</u>,

378 U.S. 108 (1964) and <u>Spinelli v. United States</u>, 393 U.S. 410 (1969), which required that

courts evaluate an informant's veracity and basis of knowledge, adopting instead a totality of the

circumstances test.  <u>Gates</u>, 462 U.S. at 230-31.  It noted that "our decisions applying the totality-

of-the-circumstances analysis . . . have consistently recognized the value of corroboration of

details of an informant's tip by independent police work."  <u>Id</u>. at 241.

> The corroboration of the letter's predictions that the Gates' car
> would be in Florida, that Lance Gates would fly to Florida in the
> next day or so, and that he would drive the car north toward
> Bloomingdale all indicated, albeit not with certainty, that the
> informant's other assertions also were true. . . . It is enough, for
> purposes of assessing probable cause, that corroboration through
> other sources of information reduced the chances of a reckless or
> prevaricating tale, thus providing a substantial basis for crediting
> the hearsay.

<u>Id</u>. at 244-45 (internal citation & quotation omitted).

> Finally, the anonymous letter contained a range of details relating
> not just to easily obtained facts and conditions existing at the time
> of the tip, but to future actions of third parties ordinarily not easily
> predicted.  The letter writer's accurate information as to the travel
> plans of each of the Gates was of a character likely obtained only
> from the Gates themselves, or from someone familiar with their not
> entirely ordinary travel plans.

<u>Id</u>. at 245.

In <u>Alabama v. White</u>, 496 U.S. 325 (1990), the underlying facts involved the

police receiving an anonymous telephone call, reporting that Vanessa White would be leaving a

particular apartment at a particular time in a brown Plymouth station wagon with a broken right

tail light and would be going to a particular motel, in possession of drugs in a brown briefcase.

Id. at 327.  Police watched White leave the building containing the named apartment with

nothing in her hands, get into the brown Plymouth station wagon with its broken right tail light,

and head toward the named motel.  Police stopped the car and, with White's consent, found a

brown briefcase containing drugs.  Id.  Relying on Gates, the Court recognized that the tip by

itself would not provide the police with the reasonable suspicion to stop White's car, because the

tip did not disclose how the informant had obtained the information or provide any basis upon

which to judge the tipster's veracity.  The Court found the stop proper nevertheless for even

though "the tip was not as detailed, and the corroboration was not as complete," the required

degree of suspicion was not as great.  Id. at 329.  The Court observed:

> [B]ecause an informant is shown to be right about some things, he
> is probably right about other facts that he has alleged, including the
> claim that the object of the tip is engaged in criminal activity.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> We think it also important that, . . . the anonymous [tip] contained
> a range of details relating not just to easily obtained facts and
> conditions existing at the time of the tip, but to future actions of
> third parties not easily predicted. The fact that the officers found a
> car precisely matching the caller's description in front of the 235
> building is an example of the former.  Anyone could have
> "predicted" that fact because it was a condition presumably
> existing at the time of the call.  What was important was the
> caller's ability to predict respondent's *future behavior*, because it
> demonstrated inside information. . . . When significant aspects of
> the caller's predictions were verified, there was reason to believe
> not only that the caller was honest but also that he was well
> informed, at least well enough to justify the stop.

Id. at 331-32.

Finally, in Florida v. J.L., 529 U.S. 266 (2000), an anonymous caller told Miami

police that a young African-American man standing at a particular bus stop and wearing a plaid

shirt was carrying a gun.  Police saw three black men at the bus stop; J.L. was wearing a plaid

shirt.  Id. at 268.  Police frisked J.L. and found a gun.

/////

/////

The Supreme Court upheld the Florida courts' suppression of the weapon:

> The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. . . . All the police had to go on was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing that he had inside information about J.L.

Id. at 271.  The Court recognized, as the state argued, that the tipster provided an accurate physical description of J.L.:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense:  It will help the police correctly identify the person whom the tipster means to accuse.  Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

Id. at 272.[10]

In this case, the friend told the informant who told Giffin that Forman and petitioner had admitted to the robbery and had allowed him to use a pipe taken in the robbery, a pipe which he loaned to the informant who, in turn, showed it to Giffin.  The friend also said a stolen pipe was in petitioner's apartment; nothing in the affidavit suggests how he came by this

---

[10]  Respondent suggests that the friend, whom he calls the tipster, was not really anonymous and therefore could not lie with impunity because the police could eventually track him down through Giffin, to the informant and ultimately to the friend.  Under this scenario, the tipster's reliability is ensured because he will fear adverse consequences if he is lying.  Respondent's Post Hearing Brief at 11-12.  The court is not persuaded by this scenario.  There is nothing in the affidavit itself, nor was there anything presented to this court or to the state magistrate, which shows that the tipster gave information to the informant in the expectation it would be passed to Giffin, much less to the police.  Moreover, to the extent respondent suggests that the tipster's statement is against penal interest–he admitted receiving stolen property, in essence–the court rejects it as a basis for finding his statements reliable.  Although the Supreme Court has recognized that a statement against penal interest carries indicia of reliability, it did so in a case in which the police knew the identity of the informant.  United States v. Harris, 403 U.S. 573, 575, 585 (1971) ("[t]he police ... almost certainly knew [the informant's] name" and had "a sworn verbal statement" from the informant.).

1   knowledge.   Finally, the friend provided petitioner's telephone number to the informant, who, in

2   turn, passed it on to Giffin.  The friend did not provide petitioner's address; rather, Giffin used

3   the telephone number and his caller ID to find an address.

4          That the friend had access to the proceeds of the robbery suggests that he did, in

5   fact, secure his knowledge of the crime from the robbers.  Yet the tipster's access to the pipe by

6   itself does not show that the pipe would be found at petitioner's apartment.  United States v.

7   Campbell, 732 F.2d 1017, 1020 (1st Cir. 1984) ("Shell casings could come from anywhere.  One

8   could not find probable cause that defendant was presently in possession of a 30 calibre rifle on

9   the basis that a hitherto unknown informant had said that some other individual, known only to

10  him, had given him a casing, at some undisclosed date, allegedly coming from such a rifle in

11  defendant's possession.").  Moreover, the friend's tip did not include the range of detail nor did it

12  provide any predictive information that might show the reliability of the overall tip.  Gates, 462

13  U.S. at 245; People v. Terrones, 212 Cal.App.3d 139, 149 (1989) (an explicit and detailed tip is

14  entitled to greater weight).  Accordingly, even if this court concludes that the information

15  provided shows the basis of the friend's knowledge, there is not enough information from the tip

16  itself for a neutral state court magistrate to have determined its reliability.

17          In addition, there is almost nothing in the affidavit about the informant, the second

18  hearsay declarant.  According to Giffin, the informant received his information directly from the

19  friend, but the information itself provides nothing suggesting its reliability.  It is true, according

20  to Giffin, that this informant turned down the reward Giffin had offered, but this is insufficient in

21  itself to show the reliability of the information provided.

22          As noted above, the Supreme Court has recognized that corroboration of an

23  anonymous tip may show the tipster was both honest and sufficiently informed to support a

24  search.  Alabama v. White, 496 U.S. at 332; Gates, 462 U.S. at 245.  In this case, Allison verified

25  that petitioner lived at the address tied to the telephone number provided by the friend and

26  determined that petitioner drove a blue Ford Expedition, as Giffin had reported.  He also

1  determined that Forman had a record for brandishing an imitation firearm and that petitioner and

2  Forman matched the sketchy descriptions of the robbers.  This also is not sufficient.

3          In J.L., 529 U.S. at 272, the police had corroborated the anonymous tip by

4  observing that a black male was standing where the tipster said he would be and was wearing a

5  plaid shirt.  The Court found this insufficient because the corroboration did nothing to show that

6  the tip was reliable in its "assertion of illegality."  The federal Courts of Appeals and the

7  California courts also recognize that corroboration of innocent detail is insufficient.  United

8  States v. Wilhelm, 80 F.3d 116, 120-21 (4th Cir. 1996) (confirmation of "innocent static details"

9  insufficient to support an anonymous tip; in this case, officer corroborated informant's directions

10  to a house, where he claimed to have seen the residents sell marijuana; "[a]lmost anyone can give

11  directions to a particular house without knowing anything of substance about what is going on

12  inside that house"); United States v. Leake, 998 F.2d 1359, 1365 (6th Cir. 1993) (caller said

13  residents of a particular house had marijuana in the basement; police verified that the house had a

14  basement; this was insufficient); Higgason v. Superior Court, 170 Cal.App.3d 929, 940 (1985)

15  (officers verified "pedestrian facts"–defendant's address and physical description, but did not

16  corroborate any of the information pertaining to the criminal activity; insufficient to establish

17  probable cause).

18          As noted above, the tipster in this case was able to produce a stolen pipe, which

19  the informant showed to Giffin.  Giffin, who is presumed to be reliable, identified the pipe as one

20  taken in the robbery.  As respondent argues, this does show that the tipster "had inside

21  information" about the robbers; it does not show that he had inside information about petitioner.

22  Allison did nothing to corroborate "the informant's most serious allegation," that petitioner was

23  the robber and had proceeds from the robbery in his apartment.  United States v. Tuter, 240 F.3d

24  1292, 1297 (10th Cir. 2001); Campbell, 732 F.2d at 1020 (informant could have received shells

25  anywhere; his claim that he received them from defendant did not establish probable cause to

26  believe that defendant had a rifle).

B. <u>Leon</u>

The determination that the affidavit in support of the search warrant did not establish probable cause to search petitioner's apartment does not end the inquiry.  In <u>United States v. Leon</u>, 468 U.S. 897, 919-21 (1984), the Supreme Court held that when an officer acts "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment," evidence seized under the authority of a search warrant that is later invalidated should not be suppressed.  The Court defined its test as an objective one, but one which "requires officers to have a reasonable knowledge of what the law prohibits."  <u>Id</u>. at 919 n.20.  While it recognized that each inquiry would be fact specific, it found four situations in which reliance on an invalidated warrant could not be deemed to be in good faith:  (1) the affiant knowingly or recklessly misleads the magistrate with false information or material omissions; (2) the magistrate "wholly abandoned his judicial role;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and (4) the warrant itself is facially deficient in its description of the place to be searched or the things to be seized.  <u>Id</u>. at 923; <u>see also</u> <u>People v. Camarella</u>, 54 Cal.3d 592, 596 (1991) ("we distill from <i>Leon</i> . . . the following:  If a well-trained officer should reasonably have <i>known</i> that the affidavit failed to establish probable cause (and hence that he should not have sought a warrant), exclusion is required under the third situation described in <i>Leon</i> . . . .").  For the good faith exception to apply, "the officer's affidavit must establish at least a colorable argument for probable cause." <u>United States v. Luong</u>, 470 F.3d 898, 903 (9th Cir. 2006).  This standard is met if the affidavit provides "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." <u>Leon</u>, 468 U.S. at 926.  If a warrant would be "saved" by the good faith exception, then a habeas petitioner has not shown the prejudice necessary to support his claim of ineffective assistance of counsel.  <u>Williams v. Locke</u>, 403 F.3d 1022, 1026 (8th Cir. 2005).

/////

1          Several courts have found the good faith exception inapplicable when police

2 corroborate only the innocent details of an anonymous tip.  In United States v. Helton, 314 F.3d

3 812, 816 (6th Cir. 2003), the court considered Leon's application to an affidavit based on

4 information from a known, credible informant who, in turn, received information from an

5 unknown, anonymous tipster who reported seeing cash in a particular house and recounted

6 statements from one suspect about her role in drug dealing.  The known informant described the

7 house the tipster had visited; the police determined that the three suspects had been in frequent

8 telephone communication and confirmed that the person named by the tipster lived in the house

9 the tipster claimed to have visited.  The court rejected the government's argument that the search

10 was saved by the good faith exception: "at a minimum, a reasonable officer would have sought to

11 corroborate FBI-A's statements further . . . ." because the tipster's statements had little weight.

12 Id. at 824-25; see also Leake, 998 F.2d at 1367 (officer did not rely in good faith on warrant

13 when affidavit recounted tips from anonymous informants corroborated only as to innocent

14 details); United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996) (anonymous tip with nothing

15 showing informant's truthfulness or reliability, corroborated only as to innocent detail; Leon does

16 not apply).  In these cases, the anonymous informants provided their descriptions of criminal

17 behavior and the police verified only innocent details.

18          In contrast, in United States v. Clark, 31 F.3d 831, 834-36 (9th Cir. 1994), an

19 anonymous informant told police that Clark had moved to Alaska with another man to grow

20 marijuana.  The affiant corroborated this story by his observation that Clark's electricity use was

21 high, that those who grow marijuana indoors often use substantial amounts of electricity, and that

22 the house had other sources of power.  The Ninth Circuit found this corroboration insufficient to

23 establish probable cause, but an adequate basis for application of the good faith exception to the

24 exclusionary rule.  In United States v. Danhauer, 229 F.3d 1002 (10th Cir. 2000), an anonymous

25 informant told police that the Danhauers were cooking methamphetamine in their home and that

26 a person named Casey acted as a lookout.  An officer confirmed the description of the

1  Danhauer's property and observed Robbi Danhauer making several trips between home and

2  garage.  He also learned that both suspects had criminal records related to drugs and

3  paraphernalia as well as other offenses and that Robbi, on probation, had submitted a urine test

4  that was positive for methamphetamine.  The Tenth Circuit found that the affidavit did not

5  support probable cause because it did not demonstrate the informant's basis of knowledge or

6  "adequately verify the informant's most serious allegation, that the Danhauers were

7  manufacturing methamphetamine."  Id. at 1004.  Nevertheless, the court found the good faith

8  exception applied: "the absence of information establishing the informant's reliability or basis of

9  knowledge does not necessarily preclude an officer from manifesting a reasonable belief that the

10  warrant was properly issued . . . particularly when the officer takes steps to investigate the

11  informant's allegation."  Id. at 1007.  The officer's investigation provided a sufficient link

12  between the informant's statements and criminal activity.

13          This case does not fit neatly into a Leon analysis.  It is true that Detective Allison

14  did little to corroborate the friend's tip, which passed through the informant to Giffin.  The

15  friend, however, was able to produce property taken during the robbery, a tangible connection to

16  the crime.  In cases finding Leon inapplicable, informants gave information, but none of the

17  information relating to the crime was corroborated.  In this case, the friend gave the informant

18  fruits of the crime, which Giffin was able to identify.  It is true, as petitioner argues, that the

19  friend could have been lying about the source of the pipe and it is because of that possibility that

20  the affidavit could not establish probable cause without further corroboration.  The inquiry is

21  different for the application of the good faith exception, however:  would a reasonably trained

22  officer understand that the warrant was necessarily deficient when the crime victim was able to

23  identify some of his stolen property, presented to him by someone known to him, who declined a

24  $5,000 reward?

25          There is more.  Two deputy district attorneys reviewed the affidavit before Allison

26  presented it to the reviewing magistrate, PEHE, Ex. 6 at 12, a factor this court must consider in

1   evaluating objective good faith reliance on an affidavit.  United States v. Mendonsa, 989 F.2d

2   366, 369 (9th Cir. 1993); United States v. Johnson, 78 F.3d 1258, 1264 (8th Cir. 1996).

3            The ultimate result cannot be based on what this court might do if considering the

4   affidavit on direct review.  Applying Leon to the facts of this case, the good faith exception to the

5   exclusionary rule is satisfied.

6            C.  Other Matters

7            Burdick's billing records contain no claim for research, but do contain time spent

8   in reviewing discovery and preparing for court.  Burdick testified he considered filing a motion to

9   suppress, but rejected such a motion as too risky in light of petitioner's potential exposure and

10  the strength of the evidence.  Had the motion to suppress been successful, the physical evidence

11  and petitioner's confession would have been suppressed.  Burdick testified without contradiction

12  that a co-defendant, presumably Joshua Merritt, had agreed to testify against petitioner.  Nothing

13  in the record confirms this, yet nothing contradicts it either.  Because of this, the court cannot say

14  that reasonable professional judgment would necessarily favor pursuing a motion to suppress

15  with a chance, but no guarantee, that Leon could be overcome.

16           Finally, this court of course must apply the AEDPA rather than decide the case de

17  novo.  Under the AEDPA's stringent standards, the court cannot say that the state court's

18  determination was unreasonable or contrary to federal law.

19           Accordingly, IT IS HEREBY RECOMMENDED that the petition for a writ of

20  habeas corpus be denied.

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

1       These findings and recommendations are submitted to the United States District

2 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3 days after being served with these findings and recommendations, any party may file written

4 objections with the court and serve a copy on all parties.  Such a document should be captioned

5 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6 shall be served and filed within ten days after service of the objections.  The parties are advised

7 that failure to file objections within the specified time may waive the right to appeal the District

8 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9 DATED:  March 31, 2008.

_____
U.S. MAGISTRATE JUDGE

2:farr1758.157

29